UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHARM-RX CHEMICAL CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>BMP, BULK MEDICINES AND PHARMACEUTICALS PRODUCTION GMBH, and B.M.P. PHARMA TRADING AG,<br><br>*Defendants.* | Civil No.: 2:15-cv-08276 (KSH) (CLW)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

This action arises out of a business transaction wherein BMP, Bulk Medicines and Pharmaceutical Production GMBH, and B.M.P. Pharma Trading AG (collectively, "BMP") sold glycine to plaintiff Pharm-Rx Chemical Corporation ("Pharm-Rx"). According to the complaint Pharm-Rx has filed, contrary to its expectations under the parties' contract the glycine turned out to be Chinese-manufactured, subjecting Pharm-Rx to a $715,449.03[1] anti-dumping duty. BMP has filed a motion for summary judgment under Fed. R. Civ. P. 56 on two grounds: (1) the forum selection clauses referenced in BMP's sales confirmations are valid and enforceable and designate jurisdiction in Germany; and (2) Pharm-Rx has "failed to sufficiently support" its tort and contract claims against BMP. (D.E. 42-4, Moving Br.)

---

[1] The stipulated facts provide that Pharm-Rx paid "$477,966.02 and $237,483.01 in connection with the antidumping duties," which accounts for a total of $715,449.03. (D.E. 41, Stip. Facts ¶ 68.) In its briefing, Pharm-Rx asserts that it paid a $775,499 antidumping duty, citing "Stip Fact 68." (Moving Br. 7.) The Court therefore assumes that Pharm-Rx erred in its calculation and that the total amount paid was $715,449.03.

As such, BMP raises a procedural challenge and a substantive challenge to this lawsuit.

**I.     BMP's Procedural Challenge (Points I & II in Moving Brief; Point I in Reply Brief)**

A movant seeking summary judgment has the obligation to show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Demonstrating that no material facts are in dispute requires the movant to show that the non-movant "has failed to establish one or more essential elements" of its case. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). To permit the Court to make this assessment, Fed. R. Civ. P. 56(c) mandates that the party contending that a fact is undisputed or cannot be disputed must support that assertion by citing "particular parts" of specified types of materials or otherwise *show* the absence of a genuine dispute. To the same end, our local rules mandate that the movant supply a statement of undisputed material facts "in separately numbered paragraphs *citing to affidavits and other documents submitted in support of the motion*." L. Civ. R. 56.1(a) (emphasis added). Absent this effort on the part of the movant, the Court is left to shuffle through the record to identify the precise scope of the issues disputed on summary judgment and whether any such dispute is "genuine." Here, BMP supplied a statement of undisputed facts (D.E. 42-1), but cited nothing to support the 56 paragraphs in that statement. In its reply brief, BMP claims it thought these references were "unnecessary" because its factual assertions came from the 103-paragraph stipulated facts section of the Final Pretrial Order. That dismissive approach not only violates the express language of our local rule and likely contravenes the strictures of Rule 56, it impedes the Court's ability to evaluate BMP's arguments.

As troublingly, BMP's approach (or, to be generous, its misunderstanding of summary judgment procedure and the Court's task in evaluating motions seeking summary judgment) infects the entirety of its briefing in support of its motion. In its opening brief, BMP doesn't begin with the standard governing the review of its motion—that appears on page 29 of its 30-page

submission. Instead, BMP begins by arguing that a forum selection clause appearing in various BMP sales confirmations and invoices is valid and controlling, without making any attempt to place that argument in a legal framework, identify the standard the Court should apply to the issue, or explain what substantive claims by plaintiff are affected. It is unclear, for example, whether BMP is seeking dismissal of the entire action (and all substantive claims) under Fed. R. Civ. P. 12 based on the discovery ordered by Magistrate Judge Waldor in advance of any dismissal motion practice, or whether it is seeking to apply the summary judgment standard to this particular issue. There is some support for the former position, given that the fifth subpoint in BMP's first argument is a *forum non conveniens* analysis, but ultimately, the Court is left to sort out what specifically BMP wants, and what procedural construct should govern its evaluation of BMP's requests.

This morass is complicated even further by the many factual assertions BMP makes in its briefing that are bereft of citation (*e.g.* Moving Br. 11, 16, 20).

Additionally, BMP's strategy has led to a significant issue – the law that should govern resolution of whether the forum selection clause made it into the agreement between the parties. According to BMP, that issue requires a complex choice of law analysis that is being laid out fully for the first time on reply, with Pharm-Rx consequently having no opportunity to respond to its substance. This is not only problematic because it risks prejudice to Pharm-Rx; it is a very real obstacle to the Court's decision, which should be arrived at with the benefit of a full exposition of both sides of this issue.

Our procedural rules introduce necessary structure to aid in the truth-seeking process, and the rules governing summary judgment in particular aid the Court in discerning whether an issue is triable. BMP's motion does not put the Court in a position to competently rule on the question of whether a valid, enforceable forum selection clause exists in its contractual relationship with Pharm-Rx, and, if one does, what effect that clause would have on the constellation of claims

plaintiff has asserted. As a consequence, the Court denies summary judgment on the issues in Points I and II of the moving brief and Point I of the reply brief, which, boiled down, appear to challenge whether this case is properly in this Court.[2] Having so ruled, the Court moves on to resolution of BMP's arguments that it is entitled to summary judgment in its favor on the substance of Pharm-Rx's tort and contract claims, which both parties have briefed based on New Jersey law.

II. **BMP's Substantive Challenge Seeking Summary Judgment in Its Favor on Plaintiff's Fraud, Negligent Misrepresentation, Breach of Covenant of Good Faith and Fair Dealing, False Advertising, Lanham Act, and NJFCA Claims (Points III through VII in Moving Brief; Point II in Reply Brief)**

A. **Factual Background**

Pharm-Rx is a New Jersey-based corporation that markets and distributes chemicals, active pharmaceutical ingredients, and dietary ingredients to finished dosage manufacturers in the pharmaceutical, nutraceutical, and food industries. (D.E. 41, Final Pretrial Order, Stip. Facts ¶¶ 2-3.) BMP is a German corporation and "manufacturer, marketer, and distributor of chemicals for the pharmaceutical, nutraceutical, and food industries." (*Id.* ¶¶ 4-6.)

Mark Bostel, a Pharm-Rx sales representative, first emailed BMP on September 25, 2014, expressing Pharm-Rx's interest in purchasing glycine, an amino acid that is commonly found in proteins and used as an additive in certain food and nutraceutical products. (*Id.* ¶¶ 7, 13.) Bostel requested information on pricing and lead time for full container load ("FCL") shipments. (*Id.* ¶ 13.) A few days later, Henning Nau, an officer of BMP, emailed back that BMP had "a kind of sole distribution agreement for the [glycine] with [Crossroads Ingredients]," and suggested that Bostel contact Paul Meluso there. (*Id.* ¶ 14; D.E. 42-3, BMP Exs., Ex. 2.) On October 14, Bostel wrote back: "Let us know if this situation changes as we have a large demand for this

---

[2] Under Rule 56(e)(1) and (4), the Court grants BMP, should it choose, the opportunity to file a properly supported motion on its contention that this case in whole or in part can only be tried in a German court.

4

product . . . . [W]e will not be competitive if we have to buy through another distributor locally." (Stip. Facts ¶ 15.) This email prompted a different response from Nau, who offered to meet with Bostel at Pharm-Rx's New Jersey office. (*Id.* ¶ 16.)

Nau traveled to the United States, and he and Bostel met on November 13 in New Jersey. (*Id.* ¶ 17.) The record reflects that they offer very different accounts of the information they exchanged during their in-person meeting. (*See* D.E. 43-10, Bostel Aff. ¶¶ 3-8; D.E. 42-2, Nau Decl. ¶¶ 55-57.)

In his declaration, Nau stated that he "did not disclose the name of BMP's glycine supplier (because I did not want Mr. Bostel to circumvent BMP), but told Mr. Bostel that our supplier was located in 'a third-world country in Asia.'" (Nau Decl. ¶ 55.) Nau also testified that he told Bostel that BMP "repacks and re-labels" pharmaceutical ingredients and that BMP "identifies itself as the manufacturer in order to avoid disclosing sourcing information that would hurt it competitively." (*Id.* ¶ 57.) He further asserted that European and German law permit BMP to refer to itself as a manufacturer because "under certain circumstances, the re-packing or re-labeling of a pharmaceutical ingredient is considered a manufacturing process." (*Id.*)

According to Bostel, during the meeting in New Jersey he "advised Nau that Pharm-Rx did not want to purchase Glycine that was manufactured in China" and that Pharm-Rx reached out to BMP because it was "a German Company that manufactured Glycine." (Bostel Aff. ¶ 5.) In his deposition, Bostel stated that Nau affirmatively represented that BMP manufactured glycine in Germany. (D.E. 43-5, Bostel Depo. 11-12 ("Q: [Nau] at some point told you that BMP actually manufactures glycine? A: Correct."); Bostel Aff. ¶ 6.) Bostel also denied that Nau disclosed that BMP's glycine supplier was "located in a third world country in Asia" or that "BMP repackages and relabels the products that it sells," nor did Nau "mention anything about German or European pharmaceutical law." (Bostel Aff. ¶¶ 6-7.)

5

On November 18, Bostel emailed Nau, copying Carlos Doussinague, Bostel's supervisor, stating that Pharm-Rx was "excited to potentially partner on Glycine and some other products discussed," and that Bostel was "fairly confident" that Pharm-Rx and BMP could "work together in the coming months on Glycine." (Stip. Facts ¶ 18.) Bostel requested a credit application and a sample of the product. (*Id.*) BMP shipped the two requested glycine samples to Pharm-Rx on November 27, emailing two certificates of analysis for the samples on BMP letterhead and a cover letter from Stephanie Breme, BMP's quality control manager. (D.E. 43-1, Pharm-Rx Exs., Ex. 5.) Certificates of analysis certify the quality and purity of pharmaceutical chemical compounds and are prepared by the manufacturer. (Nau Depo. 37 ("Q: The manufacturer prepared the certificate of analysis, correct? A: Correct. Q: Because the manufacturer is the one that actually does the testing, correct? A: Yes.").)

On December 9, Nau emailed Bostel a sample label that read "Manufacturer—BMP Production GMBH [Street Address] Parchim, Germany." (Stip. Facts ¶ 25; Pharm-Rx Exs., Ex. 6.) Nau noted: "Obviously we can delete the bmp production and mention[] only the FDA Reg no. on the label." (Pharm-Rx Exs., Ex. 6.) Bostel confirmed by email that the "sample label" BMP provided would "be fine for this shipment," attaching a purchase order that reflected that "BMP was to provide, among other documents, 'ORIGINAL CERTIFICATE OF ORIGIN.'" (Stip. Facts ¶¶ 25-26.)

On December 10, Nau emailed Bostel and Doussinague that BMP was unable to issue a certificate of origin ("COO") for the glycine "coming from Europe." (*Id.* ¶ 28; Pharm-Rx Exs., Ex. 8.) Bostel testified that he did not interpret that statement as an implication that the product was not made in Europe, but rather as a statement expressing that it "can be difficult to obtain a certificate of origin." (Bostel Depo. 32.) This communication prompted Doussinague to email Bostel separately and ask him if a certificate of origin was required. (Stip. Facts ¶ 29.)

Doussinague wrote: "[T]he fact that they can't provide that proves that they are just repacking Chinese material." (*Id.*)

Later that day, Bostel emailed Nau that Pharm-Rx "would like to proceed with this order," asking Nau to "push the manufacturer on this shipping schedule." (*Id.* ¶ 31.) Nau sent a reply email on December 11 stating, "Please find enclosed the sales contracts for the 3 FCL." (*Id.* ¶ 32.) He attached three documents titled "SALES—CONFIRMATION" that set forth the price of glycine ($3.40/kg) and delivery conditions (CIF sea Philadelphia, USA). (*Id.* ¶¶ 32-33.) The International Chamber of Commerce's Official Rules for the Interpretation of Trade Terms ("INCOTERMS") "defines CIF—Cost, Insurance and Freight—as meaning that 'the seller delivers when the goods pass the ship's rail at the port of shipment.'" (Nau Decl. ¶ 66.)

In each document the following language appears:

> Please send us the copy of this sales confirmation duly accepted and countersigned by you by fax or e-mail. Valid is the German version of our General terms and conditions, translation of which can be sent upon request or can be seen at our homepage www.bmp.ag. Place of jurisdiction is Hamburg, Germany.

(*Id.* ¶ 35; Pharm-Rx Exs., Exs. 11-13.) Pharm-Rx did not send BMP a countersigned copy of the sales confirmations. (Stip. Facts ¶ 36.)

In early January, Nau emailed Bostel that the shipments were proceeding according to schedule. (*Id.* ¶¶ 39-41.) On February 24, 2015, Petra Hettwer, a BMP employee, emailed Bostel and attached the following shipping documents for two FCLs of glycine: two invoices stating "Manufacturer: bmp productions gmbh" (Pharm-Rx Exs., Exs. 14, 15), a bill of lading, two certificates of analysis from BMP Bulk Medicines & Pharmaceuticals, and two certificates of analysis from the Jizhou City Huayang chemical Company in Jizhou, China. (Stip. Facts ¶ 44.) On March 17, Hettwer send another round of shipping documents for the third FCL of glycine. (*Id.* ¶ 55.) Pharm-Rx accepted all three deliveries of glycine and paid BMP in full for both shipments. (*Id.* ¶¶ 50, 59-61.)

In July 2015, the United States Department of Customs and Border Protection ("CBP") issued two requests for information about the identity of the manufacturer and supplier of the two shipments of glycine. (Pharm-Rx Exs., Exs. 50, 51.) CBP followed those requests with two 'Notices of Action' on August 25 and 26:

> Per the Office of Regulatory Audit and the results of the anti-dumping duty survey of Pharm-Rx . . . it was established that this entry of Glycine merchandise classified with Germany as the country of origin should have been classified as Glycine from the People Republic of China (PRC) and are subject to antidumping order . . . [at] 453.79% deposit rate.

(*Id.*, Exs. 52, 53.) The notice permitted Pharm-Rx to dispute the proposed action within 20 days of its issuance. (*Id.*)

On August 25, the day Pharm-Rx received CBP's notice of action, Bostel initiated an email exchange with Nau that accounts for at least 14 of Pharm-Rx's exhibits.[3] At times these particular emails were sent at a rapid pace. From Bostel: "At our meeting you had mentioned we can receive the BMP country of origin statement for the Glycine and I realized we had never received this. Can you have this sent over?" (*Id.*, Ex. 7.) Nau responded on August 28: "[P]lease find the enclosed. I hope that helps in case you have to present it to any official authority. If nobody is asking for such certificate you please rather keep it in your own files please." (*Id.*, Ex. 9.) Attached to the email was a certification that the glycine supplied to Pharm-Rx had been "repacked and relabeled by our production facility bmp production gmbh . . . ." (*Id.*) It appears that less than four hours later, Bostel replied by email: "Material that is repacked and relabeled in Germany cannot be considered of European origin unless it was manufactured in Europe. BMP has represented themselves as the manufacturer. Please identify the name and address of the company that actually manufactured the glycine that we purchased from BMP." (*Id.*, Ex. 54.) On September

---

[3] The Court notes that ferreting out the flow of communications was complicated by Pharm-Rx's non-chronological cataloging of its exhibits, which left the Court to grapple with truncated email chains and unhelpful timestamps due to the difference in time zones.

1, Bostel emailed again asking for that information, and Nau responded by email that "a possible name of a manufacturer in Europe for Glycine in general is a company Evonik Industries AG, who purchased the business a couple of years ago from [a Belgium] company, but we never would certify that the material shipped in March 2015 was purchased from this manufacturer." (*Id.*, Ex. 28.)

The next two emails exchanged on September 1 between Nau and Bostel are relevant to the issue of whether Nau, when he met with Bostel in November 2014, made material misrepresentations that BMP was the manufacturer of the glycine that Pharm-Rx ordered. (*Id.*, Exs. 29, 55.) Nau wrote that at their meeting in New Jersey, he had let Bostel know "that bmp predication gmbh is only the repacker/relabeling company" and the "manufacturer is located in third world country in Asia." Bostel replied: "We disagree—in our meeting in November you represented yourself as the manufacturer," and demanded that Nau supply the identity of the manufacturer of the glycine "immediately." (*Id.*, Ex. 55.)

Here, the communication takes a turn. Nau's reply email stated that "all necessary information can be found in the label," and he cannot "give [Bostel] more certificates or information on this." (*Id.*, Ex. 56.) Bostel replied: "Are you refusing to provide us the actual name and address of the actual manufacturer?" (*Id.*, Ex. 57.) Nau wrote back that "beside[s] what is mentioned on the invoice and label, we will not be able to provide you with any further information, names and addresses . . . US customs can't force us or you to disclose more information related on this business." (*Id.*, Ex. 57.)

Bostel's next email stated that CBP believed that the BMP glycine was manufactured in China and intended to assess a 453.79% antidumping duty on the shipments. "Since you refuse to provide the name and the address of the actual manufacturer, can you at least confirm whether or not the glycine was manufactured in China." (*Id.*, Ex. 36.) Nau answered:

9

> This is what I thought. If I would be you, but I can't give you and advise on that, I would say under point no. 7 in the request for information:
>
> Country of origin: India
> Country of exportation: Germany
>
> A couple of questions in the report we would answer as follows:
>
> - Provide the country of origin of the glycine and all raw materials: I would say India
> - Manufacturing process: Not available. I would mention that you are not able to get detailed information.
> - Can the manufacturer's/supplier link the PO/Invoice: No, secret information.

(*Id.*, Ex. 30.) Bostel emailed back that CBP was "scrutinizing glycine shipments from India," and if the material was from Paras Intermediates in India, there would be no anti-dumping duty, but if the glycine was from AICO Laboratories or Salvi Chemical Industries, the Chinese anti-dumping duty would apply. (*Id.*, Ex. 37.) He closed by stating "We of course must provide only factual information and it is likely customs will audit the production records." (*Id.*)

Nau replied, "To be honest, I have no idea how we can be of further assistance in this delicate matter." (*Id.*, Ex. 58.)

On October 1, 2015, Pharm-Rx's attorneys sent a letter to Nau reiterating Bostel's inquiries regarding the two glycine shipments from BMP. (*Id.*, Ex. 59.) Again, Nau responded that he was unable to provide "the name of the country where the raw materials came from," "any documents which could support [its] recommendation . . . to mention as country of origin India," "detailed supplier information of the purchased [glycine]," or "a certificate of analysis from the supplier." (*Id.*, Ex. 60.)

The parties have stipulated that the glycine that BMP sold to Pharm-Rx was manufactured in China. (Stip. Facts ¶ 67.) CBP assessed a $715,449.03 anti-dumping duty on Pharm-Rx, the importer on record, which it paid. (*Id.*, ¶ 68.)

Pharm-Rx sued BMP in a seven-count complaint raising the following: (1) fraud and fraudulent inducement, (2) negligent misrepresentation, (3) false designation of origin and false

description of goods (under the Lanham Act), (4) false advertising, (5) breach of implied covenant of good faith and fair dealing, (6) the New Jersey Consumer Fraud Act ("NJCFA"), and (7) punitive damages.[4] (D.E. 1, Compl.)

**B. Standard of Review**

The governing standard of review is familiar. A party seeking summary judgment must "show[] that there is no genuine issue to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a disputed issue of material fact exists, the Court "must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002) (internal quotations omitted).

**C. Pharm-Rx's Claims**

    **1. Counts 1 and 2: Fraud and Negligent Misrepresentation Claims**

BMP claims that Pharm-Rx "did not reasonably or justifiably rely on any representation made by BMP," discussing the fraud and negligent misrepresentation claims together because "[u]nder New Jersey law, an essential element of both [claims] is justifiable or reasonable reliance on the other party's misrepresentation." (Moving Br. 14.) BMP also argues that the fraud claim fails because Pharm-Rx has not established "the existence of a deliberate misrepresentation intending to induce reliance." (*Id.* at 17.)

The elements of common-law fraud are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005) (quoting *Gennari v.*

---

[4] While a plaintiff seeking punitive damages must include a request for them in the complaint, *see* N.J.S.A. 2A:15-5.11, punitive damages are not a separate cause of action. *Hassoun v. Commino*, 126 F. Supp. 2d 353, 372 (D.N.J. 2000) (Greenaway, J.).

11

*Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)). To establish a claim for negligent misrepresentation, a plaintiff must show "[a]n incorrect statement, negligently made and justifiably relied on, [and] economic loss or injury sustained as a consequence of that reliance." *Green v. Morgan Properties*, 215 N.J. 431, 457 (2013) (internal quotations omitted).

Without conceding that it made a misrepresentation, BMP first argues that Pharm-Rx cannot demonstrate justifiable reliance. (Moving Br. 14.) BMP lays out five "undisputed facts [that] prove Pharm-Rx's knowledge before the foods shipped that the glycine was of Chinese origin." (*Id.* 16.)

> a) Henning Nau told Plaintiff on December 9, 2014, months before any goods were shipped, that BMP could not deliver a European certificate of origin for the goods. Plaintiff thus knew on December 9, 2014 that the goods were not German.
> b) On receipt of this notice, Plaintiff's Vice President observed "The fact that they cannot provide that proves that they are repacking Chinese material."
> c) Nau informed them on January 6 and 20, 2015 that the glycine was on Shipboard and on its way to Europe "from the manufacturer." This clear, additional indication that the goods were neither of German origin or manufactured by BMP cannot be ignored.
> d) Pharm-RX received, on or about the dates of shipment and long before it made any payment, certificates of analysis in the Chinese language from the Jizhou City Huayang Chemical Co.
> e) The bills of lading delivered to Plaintiff explicitly stated that BMP was a "repacker."

(Moving Br. 16.) BMP accuses Pharm-Rx of "ginn[ing] up [this] story to evade summary judgment: (i) Plaintiff conducted no independent investigation and (ii) Plaintiff denies (highly dubiously) that it noticed the Chinese certificates of analysis or the bills of lading." (*Id.*)

Pharm-Rx responds that its fraud and negligent misrepresentation claims are supported by direct evidence "that BMP never disclosed and Pharm-Rx never knew that the Glycine was of Chinese origin," and that "Pharm-Rx relied on BMP's numerous statements that it was the actual manufacturer of the Glycine." (Opp. Br. 31.) Pharm-Rx contends that the issue of whether reliance is "reasonable" is a question of fact for the jury. (*Id.*)

The Court has reviewed the list of undisputed facts that BMP proffers to prove that Pharm-Rx knew that the glycine was of Chinese origin and that any reliance on a representation to the contrary could not, therefore, be considered "reasonable." Going down the list, Nau's email informing Pharm-Rx that BMP could not deliver a European certificate of goods does not prove Pharm-Rx knew that the goods were not German. In fact, Pharm-Rx asserts that it "understood this statement to mean that . . . BMP would be unable to obtain a certificate of origin from the German government, for usual bureaucratic reasons." (Opp. Br. 34 (citing Bostel Depo. 35).) The finder of fact must decide what weight to give the information Nau supplied.

BMP presents Doussimague's email, arguing that his remark, "[t]he fact that they cannot provide [the certificate of origin] proves that they are repacking Chinese material," is smoking-gun evidence of Pharm-Rx's knowledge. Pharm-Rx describes what Doussimague wrote as a "single, clearly speculative statement by a Pharm-Rx executive who was not directly involved in the sale, did not attend the meeting with Nau, and did not have knowledge concerning BMP's repeated representations about the glycine." (Opp. Br. 34 (citing D.E. 43-7, Doussimague Depo. 53; Bostel Depo. 24-25 ("Carlos wrote an email stating a gut reaction concern about the origin and then I explained to him—he didn't know the details of our meeting, he hadn't looked over the label that BMP has sent, he wasn't aware that BMP had already done multiple transaction and had a somewhat exclusive distributor in the U.S. . . .").) Again, the fact finder must decide.

BMP asserts that its update to Pharm-Rx that the glycine was on its way to Europe was a "clear, additional indication that the goods were neither of German origin [n]or manufactured by BMP." (Moving Br. 16.) Pharm-Rx responds that "[Bostel] had been told the raw materials for Glycine would be sourced from another country and understood these raw materials were on their way to Europe to be manufactured into Glycine at BMP's German factory." (Opp. Br. 33 (citing Bostel Depo. 27).)

In response to BMP's contention that Pharm-RX received certificates of analysis from Jizhou City Huayang Chemical Company and bills of lading stating that BMP was a "repacker," Pharm-Rx denies that anyone at Pharm-Rx saw the Chinese certificates that BMP claims Pharm-Rx received.

In short, these "undisputed facts" demonstrate that BMP has evidence to offer the trier of fact and Pharm-Rx has explanations that a reasonable juror could believe, which establishes that there are disputed interpretations of events and statements foreclosing summary judgment.

Additionally, BMP argues that it never made a "deliberate misrepresentation intending to induce reliance." (Moving Br. 17.) BMP narrowly defines the misrepresentation at issue as "the statement on BMP's invoices and other documents that BMP is the 'manufacturer.'" (*Id.*) But the complaint alleges a more expansive description of the alleged misrepresentation:

> BMP's fraudulent misrepresentations and material omissions to Pharm-Rx include but are not limited to the following:
> a. BMP falsely represented that its manufacturing division of BMP companies, BMP Production GmbH, was the manufacturer of the Glycine that it sold to Pharm-Rx;
> b. BMP failed to disclose that the Glycine it sold to Pharm-Rx was in fact manufactured in China.

(Compl. ¶ 60.) Therefore, even at the pleading stage, Pharm-Rx defined the misrepresentation to include BMP's failure to disclose that the glycine was of Chinese origin. (*Id.*; Opp. Br. 25.)

BMP asserts that "[u]nder certain circumstances, a European re-packer or re-labeler of pharmaceutical material is defined as a manufacturer," and so under EU and German rules, "BMP was a manufacturer." (Moving Br. 18.) Accordingly, when BMP referred to itself as a manufacturer, it was not a misrepresentation, and so BMP could not have had the requisite intent to deceive. This technical argument evades the essence of Pharm-Rx's fraud claims: that BMP was "well-aware from its initial meeting with Pharm-Rx that Pharm-Rx did not want Glycine of Chinese origin," that "this was of prime importance to Pharm-Rx," and that BMP "repeatedly lied"

and "continually fail[ed] to disclose that the Glycine was of Chinese origin." (Opp. Br. 24-25.) Pharm-Rx has supported these assertions with Bostel's deposition testimony and the email exchanges referenced above, which establish BMP's unwillingness, when all was said and done, to answer Pharm-Rx's repeated requests for an answer about the country of origin. With these facts in the foreground, whether German law considers BMP a manufacturer is of less consequence.[5]

Finally, BMP argues that Pharm-Rx cannot establish that BMP *intended* that Pharm-Rx rely on the alleged misrepresentation. Because intent is a subjective element, "[a]s a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment." *Horizon Healthcare Svcs., Inc. v. Allied Nat'l Inc.*, No. 3-4098, 2006 WL 344277, at *9 (D.N.J. Feb. 14, 2006) (Greenaway, J.) (internal citations omitted). Here, Pharm-Rx has made sufficient factual assertions to support an inference that BMP intended to deceive Pharm-Rx, thus precluding summary judgment.

The Court denies summary judgment for BMP on Counts 1 and 2.

### 2. Count 3: Lanham Act

BMP seeks summary judgment in its favor on Count 3 because: the Lanham Act is "primarily concerned with trademark protection" and there was "no dissemination of any allegedly false statement to the public." (Moving Br. 24, 26.)

---

[5] The Third Circuit has noted that "the question of 'reasonableness' . . . [is] normally left to the jury, . . . [and] not typically resolved at summary judgment." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009); *see also Chao v. Local 54, Hotel Employees & Rest. Employees Int'l Union*, 166 F. Supp. 2d 109, 117 fn. 7 (D.N.J. 2001) (Irenas, J.) (noting that summary judgment on questions of reasonableness is only appropriate in cases where the "material evidentiary facts . . . are uncontradicted.").

The Lanham Act prohibits "any false designation of origin . . . which . . . in commercial advertising or promotion misrepresents the . . . geographic origin of his or her or another person's goods . . . ." 15 U.S.C. § 1125(a)(1).

To establish a Lanham Act claim based on false or misleading representations in commercial advertising a plaintiff must allege:

> '1) that the defendant has made false or misleading statements as to his own product or another's; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.'

*EP Henry Corp. v. Cambridge Pavers, Inc.*, No. 17-1538, 2017 WL 4948064, at *7 (D.N.J. Oct. 31, 2017) (Simandle, J.) (quoting *Warner–Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000)).

The statute encompasses more than strict trademark claims. Additionally, there is no dissemination requirement under 15 U.S.C. § 1125(a)(A); that element only exists under § 1125(a)(B), where the Lanham Act claim is in the context of misleading "commercial advertising or promotion." Defendants cite three cases in support and all three concern the Act's commercial advertising provision.

The Court denies summary judgment to BMP on Count 3.

### 3. Count 4: False Advertising

BMP argues that Pharm-Rx's common law claim for false advertising fails because New Jersey does not recognize such claims. Pharm-Rx responds that courts in this District have observed that "[u]nfair competition claims under New Jersey statutory and common law generally parallel those under § 43(a) of the Lanham Act." *Konowicz v. Carr*, 2016 WL 3610154, at *4 (D.N.J. June 30, 2016) (Shipp, J.) (internal citations omitted). The Court is satisfied that enough evidence has been adduced to put to the test the merits of this claim, noting that BMP's arguments

16

are framed around the sufficiency of the allegations, while its motion is positioned as an application for judgment in its favor.

### 4. Count 5: Breach of Implied Covenant of Good Faith and Fair Dealing

"The implied covenant of good faith and fair dealing exists in every contract under New Jersey Law." *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 579 (D.N.J. 2010) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.,* 182 N.J. 210, 224 (2005)). To establish breach of the implied covenant of good faith and fair dealing, New Jersey courts require that the plaintiff "plead facts that would show that [the] defendant[] acted in bad faith . . . 'with the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Cedar Holdings, LLC v. Menashe*, No. 16-7152, 2017 WL 1349321, at *3 (D.N.J. April 7, 2017) (Thompson, J.) (quoting *Wade v. Kessler Inst.*, 172 N.J. 327, 345 (2002)).

BMP argues that Pharm-Rx's breach of the covenant of good faith and fair dealing claim fails because Pharm-Rx has not provided evidence of bad faith, and it "cannot show any contractual benefit of which it was deprived by the alleged misconduct." (Moving Br. 19.)

Whether or not BMP acted in "bad faith" is an issue that is inextricably bound with the material issues of fact already identified in the fraud claims. These are facts from which a reasonable juror could conclude that BMP, "knowing Pharm-Rx was seeking to purchase non-Chinese glycine," sold Pharm-Rx Chinese glycine in bad faith. (Opp. Br. 38.) The Court notes that BMP inserts a new argument in its repudiation of Pharm-Rx's "bad faith" claim: BMP's refusal to disclose the name of its manufacturer "has nothing to do with the contract or its performance, relating instead to BMP's discretionary desire to protect its supply chain from a potential competitor who would cut BMP out of the next transaction." (Moving Br. 20.) This explanation alone raises genuine issues of material fact that cannot be decided on summary judgment.

Finally, BMP asserts that Pharm-Rx received the full benefit of the contract. According to BMP, Pharm-Rx contracted for the delivery of glycine meeting certain specifications at a specific time and place, and "received all the glycine it contracted to purchase, on time and at the correct price." (Moving Br. 21.) Because "nothing in the contract provides for any particular country of origin" and "nothing in the contract purports to protect the importer from the imposition of anti-dumping duties," BMP concludes that the glycine's country of origin could not be deemed to be a reasonable expectation.

BMP's facile approach contravenes an underlying purpose of the implied covenant of good faith and fair dealing: to promote "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." There is sufficient evidence of record to support Pharm-Rx's claim that it was blind-sided by BMP to withstand summary judgment and this claim is preserved. The Court denies summary judgment on Count 5.

### 5. Count 6: NJCFA Claim

Pharm-Rx alleges that BMP violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2. BMP argues that "[d]iscovery has made crystal clear that [Pharm-Rx] cannot satisfy two important elements of the NJCFA, unlawful conduct or a causal nexus between an alleged misrepresentation and an ascertainable loss." (Moving Br. 27.)

To state a claim under the NJCFA, a plaintiff must allege that the defendant engaged in an unlawful practice that caused an ascertainable loss to the plaintiff. *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox v. Sears Roebuck & Co.,* 138 N.J. 2, 17 (1994)).

The NJCFA defines an "unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the

> subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . .

N.J.S.A. § 56:8-2.

BMP argues that selling Chinese glycine to a United States purchaser is not against the law, and therefore Pharm-Rx "cannot establish [an unlawful practice,] the first prong of the test." (Moving Br. 28.) That argument ignores the evidence adduced, supported by documents supplied by BMP and Nau's evasive emails, that BMP "repeatedly made 'false promises' and 'misrepresentations' that the Glycine was manufactured in Germany, and 'concealed' and 'omitted' the material fact that it was actually manufactured in China." (Opp. Br. 39; *see also* Pharm-Rx Exs., Exs. 6, 9, 14, 15, 28, 30.)

The Court is satisfied that a causal relationship exists between BMP's alleged unlawful practice and Pharm-Rx's ascertainable loss, and BMP's request for summary judgment on Count 6 is denied.

## III. Conclusion

For the reasons indicated above, the Court denies BMP's motion for summary judgment in its entirety. An appropriate order will follow.

Date: March 31, 2019

/s/ Katharine S. Hayden\_\_\_\_\_
Katharine S. Hayden, U.S.D.J